

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

JUL 1 0 2007

CLERK

*************************************************************************

|  |  |  |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | * | CIV 06-3015 |
|  | * | **2007 D.S.D 15** |
| Plaintiff, | * |  |
|  | * |  |
| -vs- | * | MEMORANDUM OPINION |
|  | * | AND ORDER |
| DIRK KEMPTHORNE, Secretary of the | * |  |
| Interior, in his official capacity, | * |  |
| JAMES CASON, Acting Assistant | * |  |
| Secretary, Indian Affairs, in his | * |  |
| official capacity, THOMAS DOWD, | * |  |
| Director, Bureau of Indian Education, | * |  |
| Bureau of Indian Affairs, in his | * |  |
| official capacity, and CHERIE | * |  |
| FARLEE, Education Line Officer | * |  |
| Bureau of Indian Education, | * |  |
| Bureau of Indian Affairs, in her | * |  |
| official capacity, | * |  |
|  | * |  |
| Defendants. | * |  |
|  | * |  |

*************************************************************************

**Kornmann, U.S. District Judge**

## INTRODUCTION

[¶1]    Plaintiff, Cheyenne River Sioux Tribe ("CRST" or "Tribe"), instituted this suit pursuant

to the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 450m-

1(a)[1], seeking an injunction and judicial review of an adverse administrative decision.  Shortly

thereafter, defendants filed an answer requesting that plaintiff's complaint be dismissed for

failure to state a claim upon which relief could be granted.  At the court's suggestion, the parties

agreed to a Fed.R.Civ.P. 65(a)(2) consolidation of hearing with the trial on the merits.  The

parties then agreed to a partial payment of funds to plaintiff.  As part of this stipulation,

---

[1]    The ISDEAA provides original jurisdiction to the federal district courts over "any civil
action or claim" against federal agencies under the Act.

defendants released $1,766,423.00 for Title I operations at the two schools in question for School Year 2006-2007 ("SY"). With this payment, CRST has received all but $303,368.00 of the amount requested in their complaint. Per this stipulation, the court entered an order (Doc. 19) pursuant to Fed.R.Civ.P. 65(a)(2). The parties then filed cross-motions for summary judgment (Docs. 27 and 30). This memorandum opinion and order addresses these motions for summary judgment.

[¶2]     However, subsequent to the cross-motions for summary judgment, CRST filed a motion for preliminary injunction and order extending the period for obligation of funds (Doc. 42). This motion sought an injunction prohibiting defendants from expending any of the $303,368.00 in unpaid funds for SY 06-07 and a petition for the court to exercise its equitable powers to hold these funds beyond their statutory lapse date of September 30, 2007, and through the final disposition of this litigation and execution by defendants of any actions ordered by a federal court.

[¶3]     Shortly thereafter, CRST filed motions for writ of *mandamus* and preliminary injunction (Doc. 48) and a motion to amend the complaint (Doc. 50). CRST's motion for writ of *mandamus* and preliminary injunction petitioned the court for an order pursuant to Fed.R.Civ.P. 65 directing the defendants to immediately award and fully fund CRST's successor Annual Funding Agreement ("AFA") for SY 07-08, which AFA was received by the Bureau of Indian Education[2] ("BIE") on March 9, 2007. CRST's final motion seeks to amend the complaint to add Mr. Norman Fourd as a party defendant, to add a new Count V for *mandamus* and injunctive relief, and to amend its prayer for relief. This memorandum opinion and order will also address these motions.

## FACTUAL BACKGROUND

[¶4]     Plaintiff is a federally recognized Indian Tribe with its headquarters in Eagle Butte, South Dakota, on the Cheyenne River Sioux Indian Reservation. By virtue of its federal status, the

---

[2] The Bureau of Indian Education is responsible for BIA-funded elementary and secondary schools, tribally controlled colleges, higher education grants, and Johnson-O'Malley contracts. While this Bureau is under the auspices of the BIA, it operates with a degree of independence from the BIA as a whole.

Tribe is entitled to contract with the Secretary of Interior ("Secretary") "to plan, conduct, and administer programs or portions thereof" under § 102 of ISDEAA. *See* 25 U.S.C. § 450f. The Secretary, through the Bureau of Indian Affairs ("BIA") has been contracting with CRST pursuant to the ISDEAA to administer what is commonly referred to as the "Title I" educational program at two BIA operated schools on the Cheyenne River Sioux Indian Reservation. These schools, Cheyenne-Eagle Butte School ("CEBS"), in Eagle Butte, South Dakota, and the Tiospaye Topa School ("TTS"), in Ridgeview, South Dakota, are operated by the Secretary through the BIE with funds appropriated to the Secretary by Congress.[3] School administrators who govern the school are employees of the BIE, which is ultimately accountable to the Secretary. CEBS is one of the largest schools in the BIA-funded school system with a total enrollment of approximately 900 students. TTS enrolls approximately 200 students.

[¶5]    Title I of the Elementary and Secondary Education Act of 1965 ("ESEA"), Pub.L. 89-10, 79 Stat. 27,  more recently reauthorized as the No Child Left Behind Act of 2001 ("NCLBA"), Pub.L. No. 107-110, 115 Stat. 1425 (2001) (relevant sections codified at 20 U.S.C. §§ 6301-6578 (Supp. I 2001)), provided federal grants-in-aid to support compensatory education for disadvantaged children in low-income areas. Based on the theory that poverty and low scholastic achievement are closely related, Title I allocated funds to local school districts based on their number of impoverished children and the state's average per-pupil expenditures[4]. H.R.Rep. No.

---

[3]  Less than 10 percent of Indian children currently attend elementary and secondary schools receiving basic BIA funding. F. Cohen, Handbook of Federal Indian Law, § 22.03 (1982 ed.) (*citing* GAO, BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools, 3 (2001)). Of the 185 BIA-funded schools and dormitories, moreover, only about one-third are still operated directly by the BIA, while the rest are in community control, whether as "contract" schools under the ISDEAA, or "grant" schools run by tribes or Indian organizations under the Tribally Controlled Schools Act. *Id.*(*citing* BIA, OIEP, 2002 Fingertip Facts 3 (2003)).

[4]  According to the DOE, more than 50,000 schools across the country benefit from Title I funds, and these funds reach about 12.5 million students enrolled in both public and private schools. *See* U.S. Dept. of Educ., Title I, Part A Program, available at http://www.ed.gov/programs/titleiparta/index.html (last visited July 5, 2007). "Title I funds may be used for children from preschool age to high school, but most of the students served (65 percent) are in grades 1 through 6; another 12 percent are in preschool and kindergarten programs." *Id.*

95-1137, pp. 4, 8 (1978), U.S.Code Cong. & Admin.News 1978, p. 4971; S.Rep. No. 95-856, p. 5 (1978); *see* 20 U.S.C. §§ 241a, 241c(a)(2) (1976 ed.); S.Rep. No. 146, 89th Cong., 1st Sess., 5-6 (1965), U.S.Code Cong. & Admin.News 1965, p. 1446.  Prior to awarding these grant monies to state educational agencies, pursuant to a negotiated agreement[5] between the Department of Education ("DOE") and the Secretary, DOE transfers funds to the Secretary for programs at BIA funded schools.  *See* 20 U.S.C. § 6331; 20 U.S.C. § 7824.

[¶6]    For the last ten years, CRST has administered the entire Title I program at CEBS and TTS[6], and has done so pursuant an ISDEAA "model contract" between the Tribe and the Secretary.  Services that the Title I program provides to students include: additional teachers and classroom teaching assistants, extended school days, after school tutors, summer school programs, staff development funding, parent involvement programs, supplies and materials, and other services.  The  program is approved annually by the school board at each school, and the funding level for the contract is modified annually through a successor AFA based on a "Fund Distribution Document" supplied to CRST by the BIA.  The model contract of the parties was amended in 2000 to incorporate changes in the model ISDEAA contract; however, the contract is still classified as a "mature" contract with an indefinite term.  *See* 25 U.S.C. § 450l; 25 U.S.C. § 450j(c)(1).  The amended model contract authorized CRST to carry-out a "Title I ECIA Program."  ECIA is an acronym for the Education Consolidation and Improvement Act of 1981, Pub.L.No. 97-35, 95 Stat. 445 et seq., which was a prior reauthorization of ESEA.

[¶7]    Beginning in 2005, a dispute arose between the parties regarding the operational method CRST was utilizing for the contracted programs.  In a January 5, 2006, memorandum, defendant Farlee, the education line officer at the BIA Cheyenne River Agency, informed the tribal chairman that she could not award CRST's Title I contract funds unless CRST switched their Title I operational model to a "targeted assistance program."  On January 18, 2006, CRST sought an administrative hearing to resolve this dispute.  *See* 25 C.F.R. 900.170 through 900.176.

_____

[5]   This negotiated agreement between the Departments is commonly referred to as the "Final Agreement."

[6]   The remainder of the educational and other programs are operated by the Secretary.

Shortly thereafter, BIA released the full amount of Title I funds for SY 05-06. CRST relied on tribal funds to continue operations until the Title I monies were released.

[¶8]    Congress created two distinct Title I operational methods or programs for addressing the educational needs of disadvantaged children in low-income areas. Individual public schools with poverty rates above forty percent may use Title I funds, along with other funds, to operate a "schoolwide program" to upgrade the entire educational program at that particular school. *See* 20 U.S.C. § 6314. Schools with poverty rates below forty percent, or those choosing not to operate a schoolwide program, implement a "targeted assistance program" where the school must identify students who are failing, or most at risk of failing, to meet the state's standards, and then create an instructional program to address the needs of those students. *See* 20 U.S.C. § 6315.

[¶9]    On April 11-13, 2006, Stan Holder ("Holder"), Chief of the Division of Compliance, Monitoring and Accountability for the BIE, and his colleague, Lynn Lafferty ("Lafferty"), Branch Chief for Title Programs, conducted a site visit. According to Holder, the focus of the site visit was to determine if CRST could provide "schoolwide" services under the provisions of the existing contract or if the contract needed to be amended for CRST to provide "targeted assistance services." Holder identified several issues, during the site visit, which he believed would inhibit the implementation of a schoolwide program. These issues were: (1) Title I teacher supervision was separated from the non-Title I teachers; (2) Title I funds were not being used as part of a schoolwide budget that included all supplemental program funds and Title I funds were not managed by the school administrators; (3) the Title I Director's authority over Title I teachers superseded the authority of the school administrators; (4) Title I dollars were separated from other program dollars for procuring materials for Title I teachers under the contract; (5) professional development was not administered across the entire school staff in all cases, but was in some cases limited to Title I staff employed by CRST; and (6) administrators were unable to consolidate funds and to use Title I funds with other school funds.

[¶10]   Also, sometime during this site visit, Holder and Lafferty held a meeting with the Tribal Chairman, the Bureau's Education Line Officer, school board members, and the Tribal attorney. Holder and his colleague informed the meeting participants that CRST could not continue to operate their Title I program on a schoolwide basis and that the tribe could only operate the

program on a "targeted assistance" basis because CRST did not operate the entire school under its contract. Someone also reportedly asked a question, at the meeting, about why the BIA was pursuing these changes. As Holder explained to them, the BIA had made assurances to the DOE that changes brought on by ESEA's reauthorization under the NCLBA would be implemented by the BIA before funds were transferred to the Secretary for use by Bureau-funded schools.

[¶11]   On April 12, 2006, the BIA received CRST's proposed contract amendments and AFA for SY 06-07. The Title I funds sought to be allocated to CEBS and TTS for SY 06-07 were $1,683,100 and $386,700, respectively. The Title I plan for that year called for funding for new initiatives and for six new positions at CEBS (teachers, teaching assistants, and a computer support specialist) and four new positions at TTS (a teacher and teaching assistants), and for continued funding for 23 permanent positions. More importantly, the proposed contract amendments[7] and AFA[8] called for monies to operate a Title I schoolwide program rather than a targeted assistance program.

[¶12]   Upon receipt of an ISDEAA contract proposal, by law the Secretary must approve or decline the proposal within ninety days, unless the Secretary obtains a voluntary and express written consent from the tribe or tribal organization to extend the deadline. *See* 25 U.S.C.A. § 450f; 25 C.F.R. §§ 900.16 & 900.17. Defendants maintain that one of the items they relied upon, in conducting their review, was a June 23, 2006, opinion letter from Ms. Jacquelyn Jackson ("Jackson"), the Director of Student Achievement and Accountability Programs, Office of

---

[7]   CRST's proposed contract amendment states: [t]he parties acknowledge that the Title I programs at both the Cheyenne Eagle Butte School and the Tiospaye Topa School were operated on a schoolwide basis on the day before enactment of the No Child Left Behind Act of 2001, and that Sec. 1114(b)(2)(B)(i)(II) of the NCLBA [20 USC §6314(b)(2)(B)(i)(II] allows such a school to continue to operate a schoolwide program but such school is required to develop amendments to its existing plan to reflect the provisions of Sec. 1114 as contained in the NCLBA.

[8]   CRST's proposed AFA states: [t]he purpose of this annual funding agreement is to provide that the United States of America, through the Secretary of the Interior, Bureau of Indian Affairs shall supply the Cheyenne River Sioux Tribe ("Contractor") with all funds to which the Contractor is entitled pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. § 450j-1) and Contract no. CTA01T34022 ("the Contract") to carry out 'the programs, services, functions, and activities (PFSA) described in the Contract and this annual funding agreement.

Elementary and Secondary Education, Department of Education. Ms. Jackson's letter stated, "unless the contractor is managing the whole school, then it is not possible for the contractor to implement a schoolwide program because the contractor would not have authority (fiduciary or otherwise) over the operations of the whole school. A contractor that manages just the Title I component of a BIA or tribal school would need to operate as a targeted assistance program because of the limited authority it would have in the school. For instance, the contractor would not have the authority to consolidate Federal funds, which is one of the key ingredients of a schoolwide program." On June 27, 2006, Dr. Farlee faxed Ms. Jackson's letter to the Tribe and sent a memorandum to the then Tribal Chairman, Harold Frazier ("Frazier"), restating the salient information from Ms. Jackson's letter. Three days later, Dr. Farlee sent Mr. Frazier a letter declining CRST's proposed amendments and AFA.

[¶13]   Dr. Farlee's declination letter begins by reciting her approval authority and by referring generally to previous correspondence and meetings where the BIA explained why they were declining CRST's proposal. In addition, the letter then restates that CRST is eligible to run a targeted assistance Title I program and that the proposal submitted is not consistent with this. Further, the letter cites three declination criteria for the decision. These criteria were (1) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory; (2) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract; and (3) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of the programs, functions, services, or activities covered under Section 102(a)(1) of the Act because the proposal includes activities that cannot lawfully be carried out by the contractor. *See* 25 U.S.C. § 450f; 25 C.F.R. § 900.22. Dr. Farlee's letter failed to advise the Tribe of its appeal rights or to include a specific finding clearly demonstrating that one of the declination conditions exists. *See* 25 C.F.R. §§ 900.29 and 900.31. Moreover, the letter did not include a detailed explanation for the decision to decline the proposal nor did it include any of the documents the Secretary relied on in making the decision. *Id.*

[¶14]   On July 6, 2006, Dr. Farlee informed the Tribe by letter that the funding cycle for CRST's Title I contract ended on June 30, 2006. Further, the letter stated, "if staff continues to perform

7

Title I functions, they would have to be compensated with tribal administrative cost dollars or carry-over funding as a new contract is not in place." On August 1, 2006, CRST instituted this suit pursuant to the ISDEAA, seeking to reverse the declination decision and to restore funding for their Title I program.

## DISCUSSION

### I.    SUMMARY JUDGMENT STANDARD

[¶15]   The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See* Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Donaho v. FMC Corporation, 74 F.3d 894, 898 (8th Cir. 1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995). "[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corporation v. Catrett, 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. In considering the

motion for summary judgment, this Court must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. Donaho, 74 F.3d at 897-98. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## II.   THE FEDERAL GOVERNMENT'S LEGACY ON INDIAN EDUCATION

[¶16]   The court is mindful in writing this opinion of the legacy of the federal government's involvement in Indian education.[9]  The legacy is characterized by inadequate resource allocation, systematic exclusion of Indian parents and communities from any role in the education of their children, and a one-way transmission of white American education to the Indian child as a means to remove the child from his aboriginal culture and assimilate him into the dominant white culture.  Allison M. Dussias, 43 Ariz. L. Rev. 819, 822, Let No Native American Child be Left Behind: Re-envisioning Native American Education for the Twenty-First Century (2001) (*citing* Estelle Fuchs & Robert J. Havighurst, To Live on This Earth: American Indian Education (1972)).  Put another way, Native Americans have endured generations of inadequate and inappropriate education.  F. Cohen, Handbook of Federal Indian Law, § 22.03(1)(a) at 1358 (2005 ed.).

[¶17]   This legacy is borne out in contemporary measures of Indian achievement.  For example, "Indian children are among the most likely of any group to drop out of school, with studies revealing drop-out rates ranging from 20 percent to highs of 90 percent." *Id.* (*citing* Karen Swisher & Michelle Hoish, 31 J. Am. Indian Educ. 2 (1992)).  Further, "achievement levels on nationally standardized tests lag well behind national averages, and in reading have even worsened since 1990." *Id.* (*citing* Nat'l Ctr. for Educ. Statistics, Average Math Scores by Race/Ethnicity Grades 4 and 8, 1990-2003 (2004) and Average Reading Scores by

---

[9]   The impact of the federal government's involvement in Indian Education is well documented in two government reports, the Meriam and Kennedy Reports.  *See* Inst. for Gov't Research, The Problem of Indian Administration 8 (1928) (Lewis Meriam, Technical Director); Senate Special Subcomm. on Indian Educ., Comm. on Labor & Public Welfare, Indian Education: A National Tragedy--A National Challenge, S. Rep. No. 91-501, at xi (1969)

Race/Ethnicity Grades 4 and 8, 1990-2003 (2004)).  Finally, "Indian adults continue to have the lowest education levels of any group, and are only half as likely to graduate from high school or college as other adults." *Id.* (*citing* U.S. Census Bureau, Educational Attainment in the United States: March 2000 Current Population Reports P20-536 at 1, 13, 25 (2000) and U.S. Census Bureau, P148C, Educational Attainment for the Population 25 Years and Over (2000)).

[¶18]   Inadequate funding of Indian educational initiatives by the federal government has also limited the efficacy of many education laws.  *Id.*  The government has fallen far short of its responsibility to provide Indian children with an education that is at least equal to that afforded other children, and in recognizing their unique educational needs.  In short, "education has been the source of both some of the greatest aspirations of federal Indian policy and some of the greatest damage to the Indian people." *Id.*

## III.   SUFFICIENCY OF THE DECLINATION

### A.   STANDARD OF REVIEW

[¶19]   "Judicial review of federal agency administrative decisions is, unless expressly stated otherwise, governed by the Administrative Procedures Act (APA)." Friends of Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 821 (8th Cir. 2006) (*citing* 5 U.S.C. § 706 and In re Sac & Fox Tribe of Miss. in Ia./Meskwaki Casino Litig., 340 F.3d 749, 755 (8th Cir. 2003)).  This general principle suggests that judicial review of administrative decisions taken pursuant to the ISDEAA should be governed under the APA because the ISDEAA does not expressly state a standard of review.  However, courts looking at this issue have determined that Congress intended a *de novo* review for civil actions brought under the ISDEAA.  Cherokee Nation of Oklahoma v. U.S., 190 F.Supp.2d 1248, 1258 (E.D.Okla.2001), *rev. on other grds. by* Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005); Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala et al., 988 F.Supp. 1306, 1318 (D.Or. 1997).  The court is persuaded by reasoning in these cases.  Accordingly, the standard of review to be applied in this case is *de novo*.

[¶20]   Further, "[u]nlike the usual civil case in which the plaintiff bears the burden of proof by a preponderance of the evidence, the ISDEA places the burden of proof in any hearing or on appeal on the Secretary 'to establish by clearly demonstrating the validity of the grounds for declining

10

the contract proposal (or portion thereof.)'" Shoshone, 988 F.Supp. at 1318 (*quoting* 25 U.S.C. § 450f(e)).

## B.   DECLINATION PROCEDURES

[¶21]   The Secretary has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal. 25 C.F.R. § 900.16. Should the Secretary choose not to act on the proposal within the allotted 90 day period (or within any agreed extension) then the proposal is deemed approved by default. 25 C.F.R. § 900.18. Following approval by default or otherwise, the Secretary must award the contract and disburse the full amount of funds. 25 C.F.R. § 900.18.

[¶22]   Alternatively, should the Secretary decide to decline the proposal in part or in its entirety, the Secretary must do so based on one of these five specific reasons:

> (a) The service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory; (b) Adequate protection of trust resources is not assured; (c) The proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract; (d) The amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a) of the Act; or (e) The program, function, service, or activity (or a portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under section 102(a)(1) of the Act because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 C.F.R. § 900.22; 25 U.S.C § 450f(2).

[¶23]   Concerning the successor AFA portion of the proposal, the Secretary may not decline a proposed successor AFA if it is substantially the same as the prior AFA. 25 C.F.R. § 900.32. Any portion of an AFA proposal that is not substantially the same as that which was funded previously (e.g., a redesign proposal, waiver proposal, different proposed funding amount, or different program, service, function, or activity) is subject to the declination criteria and procedures. *Id.*

[¶24]   When the Secretary declines all or a severable part of the proposal, the Secretary is required:

> (a) To advise the Indian tribe or tribal organization in writing of the Secretary's objections, including a specific finding that clearly demonstrates that (or that is supported by a controlling legal authority that) one of the conditions set forth in § 900.22 exists, together with a detailed explanation of the reason for the decision to

> decline the proposal and, within 20 days, any documents relied on in making the decision; and (b) To advise the Indian tribe or tribal organization in writing of the rights described in § 900.31.

25 C.F.R. § 900.29; 25 C.F.R. § 900.152; 25 U.S.C.§ 450f(b).  Additionally, the Secretary must provide additional technical assistance to overcome the stated objections and must provide any necessary requested technical assistance to develop any modifications to overcome the Secretary's stated objections.  25 C.F.R. § 900.30; 25 U.S.C. § 450f(b).

## C. PROCEDURAL PROPRIETY OF THE DECLINATION

[¶25]   In this case, the parties disagree over whether the Secretary satisfied his burden of proof for declining the contract proposal and the successor AFA.  The defendants' view is that the Secretary's decision complied with all the statutory and regulatory requirements for declination, although they readily admit that the declination letter had some shortcomings.  They concede that the Secretary's declination decision failed to apprise CRST of its appeal rights.  Nevertheless, defendants contend that this omission caused no injury to CRST given that the Tribe was well aware of its appeal rights.  They also acknowledge the law requires specific findings and a detailed explanation.  Nonetheless, they feel the letter's findings and explanation were sufficient. Further, according to the defendants, previous correspondence and meetings between the parties also provided CRST with adequate notice and explanation.

[¶26]   The declination statutes and the regulations are unambiguous in this case.  Further, any agency action taken without statutory authorization or which frustrates the congressional policy which underlies a statute is invalid.  Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 715 (8th Cir.1979).  The Secretary acknowledges his technical failure to comply with the statutes and regulations but argues these omissions were inconsequential.  The court disagrees.  The ISDEAA puts the burden of proof on the Secretary to demonstrate the validity of his declination decision by clear and convincing evidence.  Simply reciting the declination criteria is absolutely insufficient.  The law requires a detailed explanation of the Secretary's rationale for his decision and a disclosure of the facts or documents on which he relied for his decision.  Neither of these requirements were met by the Secretary.  Therefore, the court finds that the Secretary failed to satisfy his burden of proof for declining the contract proposal.

12

[¶27]   Given the Secretary's failure to comply with the declination statutes and regulations, the court need not address the merits of actions taken by the defendants.  The contract and successor AFA for SY 06-07 are deemed approved by operation of law.  The defendants are to be ordered to forthwith pay to the plaintiff $303,368 in SY 06-07 funds.  Added to the $1,766,432 previously paid to the Tribe, the total for SY 06-07 is $2,069,800 as an approved allocation amount.

[¶28]   As to CRST's SY 07-08 proposal, defendants have waived all rights to object to the contract proposed by the plaintiff.  That contract is also approved by operation of law and will be effective for the period in question.  Defendants have also waived all rights to object to the payment to the Tribe of both direct and indirect costs.  Accordingly, CRST's motions for summary judgment and for writ of *mandamus* and preliminary injunction should be granted.

## ORDER

[¶29]   Now, therefore, based on the foregoing,

[¶30]   IT IS ORDERED:

    (1)    The motion of defendants for summary judgment (Doc. 27) is denied.

    (2)    Plaintiff's motion for summary judgment (Doc. 30) is granted.

    (3)    Plaintiff's motion for preliminary injunction and order extending the period for obligation of funds (Doc. 42) is moot.

    (4)    Plaintiff's motion for writ of *mandamus* and preliminary injunction (Doc. 48) is granted.

    (5)    Plaintiff's motion to amend the complaint (Doc. 50) is denied as moot.

[¶31]   Dated this 10th day of July, 2007.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
             DEPUTY
(SEAL)

13